## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| STEPHANIE SHALVNDA RODDY,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | CASE NO. 1:23-CV-02432<br><br>JUDGE DONALD C. NUGENT<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Stephanie Shalvnda Roddy ("Plaintiff" or "Ms. Roddy") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1; ECF Doc. 7.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

### I.　　　Procedural History

**A.　　Prior SSI Application**

Ms. Roddy filed a prior SSI application on June 13, 2016.  (Tr. 18.)  An Administrative Law Judge ("ALJ") issued a decision on September 27, 2018, finding Ms. Roddy not disabled from June 13, 2016, through the date of that decision.  (Tr. 17, 59-81.)

1

**B.      Current SSI Application**

Ms. Roddy filed the SSI application that is the subject of these proceedings on October 12, 2021.  (Tr. 17, 90, 164-70.)  She initially alleged a disability onset date of August 3, 2002, and subsequently amended that onset date to October 12, 2021.  (Tr. 17, 39-40.)  She alleged disability due to: an inability to stand; screws and bolts in her legs; arthritis and torn ligaments in her knees; bipolar disorder; and depression.  (Tr. 82, 91, 104, 115, 179.)  Her application was denied at the initial level (Tr. 100-04) and upon reconsideration (Tr. 113-15).  She then requested a hearing.  (Tr. 116-18.)

On November 23, 2022, a telephonic hearing was held before an ALJ.[1]  (Tr. 36-54.)   The ALJ issued an unfavorable decision on December 23, 2022, finding Ms. Roddy had not been under a disability since October 12, 2021, the date the application was filed.  (Tr. 14-34.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 161-63.)  The Appeals Council denied her request for review on October 27, 2023, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Plaintiff filed the pending appeal on December 22, 2023 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7, 9, 10).

## II.      Evidence

**A.      Personal, Educational, and Vocational Evidence**

Ms. Roddy was born in 1973.  (Tr. 30, 164.)  She was 48 years old on the date her application was filed.  (Tr. 30.)  She completed school through the eighth grade.  (Tr. 180.)  She had no past relevant work.  (Tr. 30.)

---

[1] The ALJ who heard and decided Ms. Roddy's 2021 SSI application was not the ALJ who decided Ms. Roddy's 2016 SSI application.

**B.**     **Medical Evidence**

   **1.**     **Relevant Treatment History**

      **i.**     **Physical Impairments**

Ms. Roddy presented to David Marsh, M.D., at University Hospitals on July 9, 2021, for follow up regarding left ankle and knee arthritis.  (Tr. 251-54.)  She reported that her left ankle was bothering her with "a little aching pain on rare occasion with some swelling," and that her left knee was not doing better following a cortisone injection in January 2021.  (Tr. 251.)  While there was no significant improvement with the cortisone injection, ibuprofen did help.  (*Id*.)  On examination, Ms. Roddy was in no acute distress.  (Tr. 252.)  She responded appropriately to questioning and was in a good mood with normal affect.  (*Id*.)  Her gait was normal.  (*Id*.)  Her left lower extremity was warm and well perfused with palpable pedal pulse, intact and normal skin, and intact sensation to light touch.  (*Id*.)  Ms. Roddy was able to flex her left knee to 110 degrees, full extension, without pain.  (*Id*.)  She had full quad strength and normal stability.  (*Id*.)  Her right knee showed full motion, normal strength, and normal stability.  (Tr. 253.)  Her left ankle had dorsiflexion to 20 degrees, full peroneal strength, normal stability, and moderate swelling.  (*Id*.)  X-rays of the left ankle and knee were taken that day.  (*Id*.)  The left ankle x-ray showed heterotopic bone and syndesmotic repair and concentric ankle mortise.  (*Id*.)  The left knee x-ray showed grade 4 medial compartment collapse.  (*Id*.)  Dr. Marsh prescribed a Medrol Dosepak, and recommended that Ms. Roddy continue with ibuprofen.  (*Id*.)  He referred Ms. Roddy to Dr. Budinsky for a left ankle cortisone injection and recommended that she establish care with Dr. Popa for possible knee replacement.  (*Id*.)

On October 22, 2021, Ms. Roddy presented to Jennifer Shockley, CNP, at Lorain County Health & Dentistry for a telehealth visit to refill her hypertension medication.  (Tr. 281-84.)  She

reported that she had been out of her blood pressure medication for a month and knew her blood pressure was up because she had been having headaches.  (Tr. 281.)  She had no other complaints.  (*Id.*)  Her mood, affect, insight, and judgment were normal.  (Tr. 282.)  CNP Shockley directed Ms. Roddy to schedule an in-person visit for a physical examination and blood pressure check to determine whether her medications needed to be adjusted.  (Tr. 281, 282.)

On February 10, 2022, Ms. Roddy had an x-ray of her right knee.  (Tr. 322.)  It showed mild-to-moderate tricompartmental degenerative changes.  (*Id.*)

On April 7, 2022, Ms. Roddy presented to the emergency room at Mercy Health for shortness of breath that had been ongoing for three to four days and stabbing chest pain with breathing that had started that morning.  (Tr. 719, 720.)  She reported a history of asthma and said that recent weather changes had caused her breathing to get worse.  (Tr. 719.)  She had inhalers but had not been using them.  (*Id.*)  She also complained of a cyst on her right groin and said she felt a lump in her breast.  (*Id.*)  Wheezing was noted on examination.  (Tr. 724.)  She had a normal range of motion, with no swelling, tenderness, deformity, or signs of injury.  (*Id.*)  Her mood, behavior, thought content, and judgment were normal.  (*Id.*)  Chest x-rays showed no evidence of pulmonary emboli and no acute cardiopulmonary disease.  (Tr. 725.)  At discharge, the impression was an acute exacerbation of chronic obstructive pulmonary disease, tobacco dependence, and an abscess of the right groin.  (Tr. 727.)

Ms. Roddy returned to see Dr. Marsh regarding her knee problems on April 15, 2022.  (Tr. 338.)  Dr. Marsh ordered and reviewed bilateral knee x-rays.  (Tr. 341, 342.)  The x-rays showed moderate right knee arthritis and severe left knee arthritis with complete loss of joint space and grade 4 present in the medial space.  (*Id.*)  On examination, Ms. Roddy was in no acute distress.  (Tr. 340.)  She responded appropriately to questioning and was in a good mood

with normal affect. (*Id.*) Her gait was normal. (*Id.*) Her left lower extremity was warm and well perfused with palpable pedal pulse, intact and normal skin, and intact sensation to light touch. (*Id.*) She was able to flex her left knee to 110 degrees, with some pain on full extension. (*Id.*) She had normal stability with trace effusion. (*Id.*) She was able to flex her right knee to 120 degrees without pain on full extension. (Tr. 341.) Ms. Roddy was diagnosed with bilateral knee arthritis, end stage, on the left and a total knee replacement was recommended. (Tr. 338.)

On April 20, 2022, Ms. Roddy presented for a new patient evaluation with Brett McCoy, M.D., at University Hospitals' Center for Orthopedics. (Tr. 334-37.) Examination of her left knee revealed no gross swelling or ecchymosis, trace effusions, slight decrease in range of motion, crepitus with range of motion, no pain with internal rotation of the hip, tenderness to palpation over medial and lateral joint line with patellar compression, no laxity to valgus / varus stress, negative Lachman's test, negative posterior drawer tests, and mild pain with McMurray's test. (Tr. 334-35.) Ms. Roddy reported increased difficulties with activities of daily living, concerns for falls, and severe pain. (Tr. 335.) Total knee arthroplasty was discussed. (*Id.*)

On April 21, 2022, Ms. Roddy presented to Robert L. Thomas, M.D., at Mercy Health Oak Point Primary and Specialty Care to establish care as a new patient. (Tr. 344-59.) Physical examination findings were unremarkable. (Tr. 354.) Her diagnoses included hypertension, chest pain, chronic obstructive pulmonary disease (COPD), gastroesophageal reflux disease without esophagitis, and bipolar disorder in partial remission. (Tr. 355.)

Ms. Roddy underwent left total knee replacement surgery on June 3, 2022, performed by Dr. McCoy. (Tr. 374-77.) At a post-operative appointment with Dr. McCoy two weeks later, on June 16, 2022, Ms. Roddy endorsed moderate pain but denied numbness, tingling, calf pain, chest pain, and shortness of breath. (Tr. 370.) She reported significant problems sleeping and

said her pain was not well controlled with her current medication regimen. (*Id*.) She also reported some concern regarding her incision. (*Id*.) On examination, there was mild swelling and a small amount of drainage in the area of the incision, but the incision appeared healthy and well vascularized. (*Id*.) X-rays showed good positioning and alignment and Dr. McCoy found Ms. Roddy was doing well post-surgery. (Tr. 371.) He encouraged Ms. Roddy to use ice and rest and discussed the importance of range of motion and physical therapy. (*Id*.)

On June 22, 2022, Ms. Roddy presented to the emergency room at Mercy Hospital, complaining of left knee pain. (Tr. 641.) On examination, Ms. Roddy had normal range of motion, including full passive range of motion in her left knee, but her incision was not healed. (Tr. 645.) She was diagnosed with cellulitis and acute pain in the left knee. (*Id*.) She was treated with medication and discharged with instructions to follow up with Dr. McCoy. (*Id*.)

On July 3, 2022, Ms. Roddy was admitted to the emergency room at Mercy Health after she fell on her knee and her incision opened. (Tr. 416-639.) She reported a sudden onset of severe, sharp, and non-radiating pain to her left knee following her fall. (Tr. 416.) On examination, she had normal range of motion, no neurological deficits, and exhibited a normal mood and behavior. (Tr. 421.) X-rays were negative for new fractures. (Tr. 421.) Her wound did not appear infected, but she was admitted for wound drainage. (*Id*.) She was discharged on July 6, 2022, with a recommendation for physical therapy to improve her functional independence and decrease the need for caregiver support upon returning home. (Tr. 459.)

On July 14, 2022, Ms. Roddy returned to Dr. McCoy for follow up. (Tr. 367-69.) She endorsed moderate pain but noted improving functional status. (Tr. 367.) On examination, she had 0-90 range of motion without issue, no laxity to varus / valgus stress, + plantar/dorsiflexion, and a negative Homan test. (*Id*.) Her incision was well healed except for a one-centimeter area

of delayed healing.  (*Id*.)  Dr. McCoy noted that Ms. Roddy's wound complication was improving and recommended that she limit flexion to approximately 90 degrees.  (Tr. 368.)

Ms. Roddy next followed up with Dr. McCoy on July 27, 2022.  (Tr. 364.)  It was noted that she was prescribed hydrocodone-acetaminophen following her knee replacement surgery and was still receiving antibiotics.  (*Id*.)  She endorsed moderate pain but had an improving functional status.  (*Id*.)  On examination, her incision was well healed except for a small portion that had scabbed over; there was no active drainage.  (*Id*.)  She exhibited a range of motion of 0-110.  (*Id*.)  There was no laxity to varus / valgus stress, + plantar/dorsiflexion, and a negative Homan test.  (*Id*.)  Dr. McCoy noted Ms. Roddy was doing well post-surgery.  (*Id*.)  There were no recommendations to limit range of motion.  (Tr. 364-65.)

On August 15, 2022, Ms. Roddy presented to Philip R. Cataline, M.D., in the infectious disease department at Mercy Health.  (Tr. 388.)  She reported that her wound was completely healed, but she still had some pain in her leg and some swelling.  (*Id*.)  Mild swelling in the left knee was noted on examination.  (Tr. 389.)  Ms. Roddy was diagnosed with an infection of prosthetic joint and instructed to follow up in four to six weeks.  (*Id*.)

On September 28, 2022, Ms. Roddy returned to the infectious disease department at Mercy Health for follow up with Rita A. Abbud, M.D., regarding her wound infection.  (Tr. 383.)  She reported occasional left knee pain when the weather was cold or rainy.  (*Id*.)  On examination, she was in no acute distress and had no musculoskeletal swelling or tenderness, no edema in the lower extremities, no motor weakness, and a normal gait.  (Tr. 384.)  Her left knee incision was well-healed, with no swelling, erythema, warmth, or tenderness, and with a normal range of motion.  (*Id*.)  Her mood and behavior were normal.  (*Id*.)

### ii. Mental Health Impairments

Ms. Roddy received mental health treatment at Far West Center prior to her alleged onset date for unspecified mood disorder, with reports of increased depression in December 2020 and March 2021 due to the loss of her son two years earlier. (*See e.g.*, Tr. 266, 268.) She reported she was doing well on her medications, which included Seroquel and Prozac. (*Id*.) When she saw Daniel Funk, APRN, on March 18, 2021, she reported frequent panic attacks and nightmares, severe mood swings, anger, and physical aggression. (Tr. 268.) On examination, her attitude was appropriate, her mood was "bad," her affect was congruent, her thought processes were goal-directed, her anxiety was moderate, she denied hallucinations, her memory, attention, and concentration were intact, her motivation/energy was fair, her speech was normal, and her judgment and insight were good. (Tr. 268-69.) Her sleep was adequate, with intact self-care / independent activities of daily living. (Tr. 269.) APRN Funk continued Seroquel and Prozac and started Ativan and Prazosin. (*Id*.)

On July 28, 2021, Ms. Roddy met with APRN Funk for follow up. (Tr. 270.) She reported doing well on her medications. (*Id*.) She described her mood as "good," and said that she was sleeping well, having fewer panic attacks, having decreased nightmares, and that her mood swings and anger were less severe. (*Id*.) She continued to report increased depression relating to the loss of her son. (*Id*.) Mental status examination findings were similar to those from her March 2021 appointment, except her mood was "good." (*Compare* Tr. 270-71 *with* Tr. 268-69.) Ms. Roddy's medications were continued, and her Prozac was increased. (Tr. 271.)

During an October 27, 2021 appointment with APRN Funk, Ms. Roddy reported her mood was "not good" and she had been "moody and stressed out." (Tr. 316.) She reported stress relating to her chronic bilateral knee pain and increased depression regarding her son's

death.  (*Id*.)  She reported moderate-severe depression (7/10) and anxiety (4/10).  (*Id*.)  She also
reported anergia, avolition, and anhedonia, but was having less frequent panic attacks and
nightmares, and less severe mood swings and anger.  (*Id*.)  Mental status examination findings
were similar to her July 2021 appointment, except her mood was "not good."  (*Compare* Tr. 316-
17 *with* Tr. 270-71.)  Her medications were continued, and Topamax was added.  (Tr. 317.)

On December 29, 2021, Ms. Roddy returned to APRN Funk.  (Tr. 318.)  She reported
doing well on her medications and described her current/recent mood as "alright."  (*Id*.)  She
reported moderate-severe depression (6-7/10) and anxiety (6-7/10) and continued to report
anergia, avolition, and anhedonia.  (*Id*.)  She was sleeping well but reported occasional
nightmares.  (*Id*.)  She continued to report less frequent panic attacks and less severe and less
frequent mood swings and anger.  (*Id*.)  Ms. Roddy's mood was "alright" and mental status
examination findings were otherwise unchanged.  (*Compare* Tr. 318-19 *with* Tr. 316-17.)  Ms.
Roddy's medications were continued, with an increase in Prazosin.  (Tr. 319.)

On March 30, 2022, Ms. Roddy returned to Far West Center for an appointment with a
different provider, Harriet Bomas, APRN.  (Tr. 326.)  She reported medication compliance and
said her symptoms were well managed but noted that she was gaining weight.  (*Id*.)  On
examination, she was cooperative with a calm mood.  (*Id*.)  Her thought process was linear, and
she denied psychosis.  (*Id*.)  Her anxiety was low, and her judgment and insight were intact.  (*Id*.)
APRN Bomas instructed Ms. Roddy to continue medication compliance, deferred any discussion
of Topamax or weight loss to Ms. Roddy's primary care provider or a specialist, and advised Ms.
Roddy to follow up with Far West Center in three months.  (Tr. 327.)

Ms. Roddy returned to APRN Bomas on August 17, 2022.  (Tr. 840.)  She reported
medication compliance, denied side effects, and said her symptoms were well managed and

controlled.  (*Id*.)  On mental status examination, Ms. Roddy was alert with an appropriate

appearance, cooperative attitude, depressed mood, congruent affect, linear thought processes,

intact memory, focused attention and concentration, normal speech and language, normal

socialization, normal energy, intact judgment/insight, and low anxiety.  (*Id*.)  It was noted that

Ms. Roddy's appetite was adequate and her self-care / independent activities of daily living were

within normal limits.  (*Id*.)  Her sleep was poor due to "recent events," including the anniversary

of her son's death and knee replacement surgery.  (*Id*.)  APRN Bomas added lamotrigine.  (*Id*.)

During an October 12, 2022 appointment with APRN Bomas, Ms. Roddy reported that

her symptoms were well managed and controlled but that she had ongoing depression.  (Tr. 837.)

Her medications included lamotrigine, Seroquel, Prozac, Ativan, and Prazosin.  (*Id*.)  She

reported medication compliance but said she only took Ativan when needed.  (*Id*.)  Mental status

examination findings were similar to her August appointment.  (*Compare* Tr. 837 *with* Tr. 840.)

## 2. Opinion Evidence

### i. Treating Source Providers

Two mental health impairment questionnaires were completed by Ms. Roddy's mental

health providers at Far West Center.  (Tr. 835-36, 842-43.)  APRN Bomas completed one on

October 26, 2022.  (Tr. 835-36 "October 2022 Opinion".))  The name of the author of the second

questionnaire, which was completed on November 9, 2022, is not legible.  (Tr. 842-43

("November 2022 Opinion").)  The available ratings in both questionnaires were "unlimited or

very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet

competitive standards," and "no useful ability to function."  (Tr. 835-36, 842-43.)

In the October 2022 Opinion, APRN Bomas reported that she saw Ms. Roddy monthly

for 20 minutes.  (Tr. 835.)  Ms. Roddy had diagnoses of bipolar disorder and PTSD and was

prescribed lamotrigine, Seroquel, Prozac, and Prazosin.  (*Id*.)  APRN Bomas said Ms. Roddy denied medication side effects, but had multiple episodes of persistent and manic symptoms, along with flashbacks and nightmares.  (*Id*.)  As to Ms. Roddy's prognosis, APRN Bomas said: "[Ms. Roddy] is in the maintenance phase of treatment."  (*Id*.)  She indicated that Ms. Roddy's impairment was expected to last at least 12 months.  (*Id*.)  She rated Ms. Roddy as having a "limited but satisfactory" ability with respect to all areas of mental functioning.  (Tr. 835-36.) She indicated Ms. Roddy would likely miss two days of work per month and would need a 60-minute lunch break and two 15-minute breaks during the workday.  (Tr. 836.)

In the November 2022 Opinion, the authoring provider indicated that: the frequency and length of contact with Ms. Roddy was monthly; Ms. Roddy's diagnosis was unspecified bipolar disorder; and Ms. Roddy was prescribed lamotrigine, Seroquel, Prozac, Ativan, and Prazosin. (Tr. 842.)  With respect to Ms. Roddy's prognosis, "chronic mental illness" was noted.  (*Id*.)  Ms. Roddy's impairment was expected to last at least 12 months.  (*Id*.)  In all but three areas, the provider rated Ms. Roddy as "[s]eriously limited, but not precluded."  (Tr. 842-43.)  In the three other areas—carry out very short and simple instructions, remember locations and work-like procedures, and ask simple questions or request assistance—Ms. Roddy was rated as having a "limited but satisfactory" ability.  (*Id*.)  The provider opined that Ms. Roddy would miss one to two days of work in a week.  (Tr. 843.)  When asked the anticipated amount of time that Ms. Roddy would be off task during an eight-hour workday due to symptoms of her impairment, the authoring provider answered "3-4" without noting the unit of measurement.  (*Id*.)

### ii.     State Agency Psychological Consultants

On January 20, 2022, state agency psychological consultant Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 85) and mental RFC Assessment (Tr.

88).  In the PRT, Dr. Haskins opined that Ms. Roddy had moderate limitations in the ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 85.)  Dr. Haskins's PRT was an adoption of the ALJ's September 2018 decision.  (*Id*.)  In the mental RFC Assessment, Dr. Haskins adopted the mental RFC from the September 2018 ALJ decision, which provided that Ms. Roddy could: perform simple, routine, repetitive tasks; make simple work-related decisions; work in a static work environment; tolerate few changes in a routine work setting that took place gradually and occurred infrequently; occasionally interact with a small group of coworkers, where contact was casual in nature; and interact occasionally and superficially with the public.  (Tr. 88.)

On May 27, 2022, state agency psychological consultant Courtney Zeune, Psy.D., affirmed Dr. Haskins PRT and Mental RFC Assessment on reconsideration.  (Tr. 93-94, 96-97.)

### iii.  State Agency Medical Consultants

On February 21, 2022, state agency medical consultant Leon Hughes, M.D., completed a physical RFC Assessment.  (Tr. 86-88.)  Dr. Hughes found new and material changes and did not adopt the physical RFC determination from the September 2018 ALJ decision.  (Tr. 87.)  He opined that Ms. Roddy had the physical RFC to perform light exertional work with: four hours of standing/walking; six hours of sitting; occasional pushing/pulling with the left lower extremity; never crawling or climbing ladders/ropes/scaffolds; occasional climbing ramps/stairs; occasional kneeling and crouching; and avoidance of exposure to dangerous machinery, unprotected heights, commercial driving, and concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  (Tr. 86-87.)

On June 6, 2022, state agency medical consultant Elaine Lewis, M.D., affirmed Dr. Hughes's physical RFC Assessment upon reconsideration.  (Tr. 95-96.)

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

Ms. Roddy testified at the hearing on November 23, 2022.  (Tr. 42-47, 49.)  She said she could not work full-time because she had a left knee replacement and her right hip gave out, making her unable to bend her knee, sleep at night, stand or walk for more than five minutes, or sit for more than five to ten minutes.  (Tr. 42-43, 44, 47.)  She had to "use one of them wheel things [at the grocery store] to sit in and move around" because she could not stand for more than five minutes.  (Tr. 43.)  After walking about five minutes, she reported that she had sit down and was out of breath.  (*Id*.)  After sitting for about five to ten minutes, she said she had to get up and walk around.  (Tr. 44.)  However, she said she had to "sit right back down" after walking.  (*Id*.)  She reported that her doctors wanted her to get her right knee replaced as well but she had not started treatment for her right knee.  (Tr. 43-44.)

Ms. Roddy lived alone in an apartment.  (Tr. 44.)  She said her family came over to help her clean and cook, or to bring her food.  (Tr. 44-45.)  She could not prepare even a simple meal, like a sandwich, because she was depressed and spent her day in her room and was unable to function.  (Tr. 45.)  She was depressed because her son was killed, and her father killed her mother.  (*Id*.)  She reported only leaving her apartment with her sister once a month to go to the grocery store.  (*Id*.)  She said her mental health had gotten worse since 2018 because her son was killed.  (Tr. 45-46.)  She did not feel like doing anything because of her physical and mental condition.  (Tr. 46.)  Her psychiatrist gave her different medications because she could not sleep at night.  (Tr. 47.)  She reported medication side effects but did not elaborate on the nature or extent of those side effects.  (Tr. 46.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 47-53.)  The VE testified that an individual with the functional limitations described in the ALJ's RFC determination (Tr. 23, 49-52), could perform the following representative unskilled, light work positions: housekeeping cleaner, merchandise marker, routing clerk, and mail clerk (Tr. 50-52).  The VE testified there would be no work available if an individual was only able to stand and walk for five minutes at a time, for a total of two hours in an eight-hour workday and sit for ten minutes at a time for a total of two hours in an eight-hour workday.  (Tr. 53.)

### III.      Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In her December 23, 2022, decision, the ALJ made the following findings:[2]

1.     The claimant has not engaged in substantial gainful activity since October 12, 2021, the application date.  (Tr. 20.)

2.     The claimant has the following severe impairments:  left ankle osteoarthritis, status-post left ankle fracture; bilateral knee osteoarthritis, status-post left total knee arthroplasty; obesity; asthma; hypertension; and bipolar disorder.  (*Id.*)

3.     The claimant does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20-23.)

---

[2] The ALJ's findings are summarized.

4.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; occasionally push/pull with the left lower extremity; never climb ladders, ropes, or scaffolds; never crawl; occasionally climb ramps and stairs; occasionally kneel and crouch; avoid concentrated exposure to respiratory irritants and all exposure to working at unprotected heights; avoid operating dangerous moving equipment such as power saws and jack hammers; and no commercial driving; she can engage in simple, routine, repetitive tasks; can make simple work-related decisions; can work in a static work environment; and can interact with the general public, coworkers, and supervisors up to occasionally for work related tasks such as asking questions, gathering information, pointing, directing where items may be placed, and serving but no directing the work of others.  (Tr. 23-29.)

5.      The claimant has no past relevant work.  (Tr. 30.)

6.      The claimant has a limited education.  (*Id.*)

7.      Transferability of job skills is not an issue because the claimant does not have past relevant work.  (*Id.*)

8.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including housekeeping cleaner, merchandise marker, routing clerk, and mail clerk.  (Tr. 30-31.)

Based on the foregoing, the ALJ found Ms. Roddy had not been under a disability since October 12, 2021, the date the application was filed.  (Tr. 31.)

## V.      Plaintiff's Arguments

Ms. Roddy presents two arguments on appeal.  (ECF Doc. 7, pp. 1, 7-15; ECF Doc. 10.) First, she argues that the ALJ erred by applying the wrong standard of review and erroneously adopting the findings of the prior administrative law judge.  (ECF Doc. 7, pp. 1, 7-12; ECF Doc. 10.)  Second, she argues the ALJ erred by finding that she had the RFC to perform light exertional work.  (ECF Doc. 7, pp. 1, 12-15.)

## VI.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Appropriately Considered 2018 ALJ Decision**

In her first assignment of error, Ms. Roddy argues the ALJ erred by applying the wrong standard of review and erroneously adopting the findings of the prior administrative law judge. (ECF Doc. 7, pp. 1, 7-12; ECF Doc. 10.)  The Commissioner argues that the ALJ did not apply a wrong standard of review or improperly consider the prior administrative law judge's findings when assessing Ms. Roddy's RFC.  (ECF Doc. 9, pp. 7-10.)

In *Drummond v. Comm'r of Soc. Sec.*, the Sixth Circuit cited to "the principles of res judicata" in holding: "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d 837, 841-42 (6th Cir. 1997).  In a related Acquiescence Ruling, the Social Security Administration ("SSA") applied *Drummond* to disability findings as follows:

18

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).

More recently, in *Earley*, the Sixth Circuit reexamined *Drummond* and its reliance on principles of res judicata, and observed: "Unusual facts, it seems to us, led to some overstatement in *Drummond* but not to an incorrect outcome."  893 F.3d at 933.  While *Drummond* was decided based on res judicata principles, the *Earley* court clarified that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'"  *Id.* (citations omitted).  Thus, the *Earley* court made it clear that the doctrine of res judicata does not apply when a claimant has filed a new application seeking benefits for a new period of disability.  *See Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662, at *4 (6th Cir. Mar. 20, 2024) (observing that the Sixth Circuit in *Earley*, "explained that *Drummond* did not intend for res judicata to foreclose the possibility of a claimant seeking review of a new application for a new period of disability").

The court then observed that the inapplicability of res judicata to such cases "helps to explain why *Drummond* referred to 'principles of res judicata' – with an accent on the word 'principles.'"  *Earley*, 893 F.3d at 933 (citing 126 F.3d at 841–43).  The court described the applicable principles as "[f]inality, efficiency, and the consistent treatment of like cases," and explained that an ALJ "honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record."  *Id.* (citations omitted).  Accordingly, the court held: "it is fair for an administrative law judge to take the view that,

absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application."  *Id.*; *see also Dennis D.*, 2024 WL 1193662, at *4 (quoting *Earley*, 893 F.3d at 933).  The court refused to hold that an ALJ "should completely ignore earlier findings and applications," explaining that "[f]resh review is not blind review" and "[a] later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making."  *Earley*, 893 F.3d at 934.

Here, the ALJ acknowledged that there was a prior administrative law decision dated September 27, 2018, finding Ms. Roddy not disabled from June 13, 2016, through the date of the September 2018 decision.  (Tr. 18.)  The ALJ in the present case observed that Ms. Roddy did not request review of the September 2018 decision, making that decision final and binding under the doctrine of res judicata, and then made the following observations regarding this application:

> the record contains new and material evidence, including new additional impairments regarding bilateral knee osteoarthritis, asthma, and hypertension, that provides a basis for a different finding of the claimant's residual functional capacity. However, the undersigned finds that the record does not contain new and material evidence to support a different finding regarding the claimant's past relevant work; therefore, the prior finding regarding this issue has been adopted in this decision.

(*Id.*)  The ALJ then provided a detailed discussion of the new records relating to Ms. Roddy's physical and mental health impairments (Tr. 24-27) and explained how she considered the findings made by the prior ALJ in the September 2018 decision (Tr. 27-29).  The ALJ acknowledged the RFC findings of the prior ALJ (Tr. 27-28), then explained her reasoning for diverging from the RFC set forth in that prior decision (Tr. 28-29).

### 1.    Physical RFC

With respect to Ms. Roddy's physical RFC, the ALJ stated:

> The undersigned is not fully adopting the prior Administrative Law Judge findings regarding the physical limitations given the new physical impairments of bilateral knee osteoarthritis, hypertension, and asthma. The undersigned concludes that

given the claimant's overall severe physical impairments, especially her bilateral knee osteoarthritis, the evidence of record continues to support the restriction to light level work with never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and occasionally kneel and crouch. The undersigned fails to find the need for limited balancing or stooping and no use of foot controls, given a lack of findings as to any significant ongoing ankle related abnormalities or treatment, no mid musculoskeletal or joint related issues, no significant right extremity findings, and no ongoing gait related abnormalities. Occasional push/pull with the left lower extremity seems better supported given the combination of the claimant's left ankle history and left knee osteoarthritis. No crawling was also added given the new findings of bilateral knee osteoarthritis. Further environmental restrictions as to the avoidance of concentrated exposure to respiratory irritants were given in accounting for the claimant's new additional impairments of asthma and hypertension, as well as preventative and safety related environmental restrictions in accounting for the claimant's overall conditions.

(Tr. 28 (emphasis added).)  When assessing Ms. Roddy's physical RFC, the ALJ considered Ms. Roddy's treatment records (Tr. 24-26) and the medical opinion evidence relating to Ms. Roddy's physical impairments (Tr. 28.)

Ms. Roddy argues that the ALJ erred in finding that there was new and material evidence regarding Ms. Roddy's physical impairments that "provide[d] a basis for a different" RFC finding than that adopted by the prior ALJ (Tr. 18), but also finding that "the evidence of record continue[d] to support the restriction to light level work" (Tr. 28) (ECF Doc. 7, p. 9 (citing Tr. 18, 28)).  She asserts "the ALJ incorrectly found that her condition had not worsened sufficiently as to reduce her from the previously concluded light level of exertion."  (ECF Doc. 7, p. 9.)  Ms. Roddy relies on *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-CV-2691, 2021 WL 1175415, at *4 (N.D. Ohio Mar. 29, 2021), arguing that "the ALJ's adoption of the findings of the prior ALJ casts a pall over the entire hearing as Plaintiff faced an unwarranted presumption that the finding of the prior hearing was correct."  (ECF Doc. 7, pp. 10-11.)

As an initial matter, the ALJ in the present case explicitly did not adopt the prior ALJ's RFC, as outlined above.  Additionally, as also explained above, the Sixth Circuit clarified in

*Earley* that a prior ALJ's findings "are a legitimate, *albeit not binding*, consideration in reviewing a second application," and an ALJ "*may* consider what an earlier judge did if for no other reason than to strive for consistent decision making." 893 F.3d at 933–34 (emphasis added). The ALJ in this case considered the RFC findings in the 2018 ALJ decision (Tr. 27-28), acknowledged and considered new evidence highlighted in Ms. Roddy's brief (*compare* Tr. 24-26 *with* ECF Doc. 7, pp. 7-8),[3] and provided a detailed explanation for both her adoption of and her divergence from the 2018 RFC limitations (Tr. 28). In *Dilauro*, in contrast, the Court found it was clear the ALJ had not provided a "fresh look" to the plaintiff's claim as required by *Earley. See* 2021 WL 1175415, at *3-4. Here, the ALJ's decision clearly reflects that she considered the non-binding 2018 ALJ Decision, gave a "fresh look" to the new evidence since that decision, and adopted an RFC that was supported by substantial evidence.

The undersigned also finds unavailing Ms. Roddy's suggestion that the ALJ applied an incorrect standard because she concluded, as did the prior ALJ, that Ms. Roddy had the RFC to perform a reduced range of light work. A similar RFC finding does not establish error. *See Dennis D.*, 2024 WL 1193662, at *5 (rejecting argument that similarity between conclusions reached by the ALJ and prior ALJ had a "bearing on whether ALJ . . . applied the correct standard"). The relevant inquiry is whether the ALJ "reached an independent conclusion" and recognized she was "not bound by the prior decision—as required under *Earley.*" *Id.* Here, the ALJ did not conclude that Ms. Roddy had the RFC to perform light exertional work because she found herself bound by the prior ALJ's decision; instead, she reached this conclusion based on a fresh and independent review of the entirety of the evidence. The simple fact that the ALJ and

---

[3] The undersigned observes that the Sixth Circuit has long held that an ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence. *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).

the prior ALJ both concluded that Ms. Roddy had the RFC to perform light exertional work is

insufficient to support a finding that the ALJ applied an incorrect standard.

### 2.    Mental RFC

With respect to Ms. Roddy's mental RFC, the ALJ stated:

> Regarding the prior mental residual functional capacity, <u>the undersigned generally
> accepts the above prior Administrative Law Judge findings, which were also
> accepted and adopted by the State agency psychological consultants</u> (Exhibits B1A,
> B2A, & B4A). <u>However, certain limitations were not adopted because the evidence
> in this claim period does not support the additional limitations since the claimant's
> mental status findings consistently showed intact attention, concentration, memory,
> and socialization</u>. Her thought processes were linear and logical without psychosis
> or delusions. Her judgment and insight were intact as recently as March 30[,] 2022
> during her visit at the Far West Center which supports the further conclusion she
> can make simple work related decisions. Moreover, <u>she cared for her grandchildren
> which suggests a higher level of ability to adapt to changes than the language of the
> prior RFC limitation that changes should be introduced slowly and explained</u>.
> (Exhibits B1A, B2A, & B4A). While the claimant has alleged worsening in her
> mental health symptoms, as detailed above, the treatment notes are not supportive
> of such findings and show a generally good response to medication with mental
> status examinations showing no significant psychological or cognitive
> abnormalities (Exhibits B6F, pgs 7-10; B8F, pg 3; & B15F, pgs 1-2, 4-5). <u>In light
> of the above, while it is reasonable to conclude that the claimant may have some
> mental functional deficits, the evidence does not support the conclusion that the
> limitations are so severe as to prevent the performance of simple, routine, and
> repetitive tasks. To reduce stress and possible exacerbation of her symptoms,
> further restrictions as to a static work environment, only simple work-related
> decisions, and occasional interaction with supervisors, coworkers, and the public
> were added</u>.

(Tr. 28-29 (emphasis added).)  The ALJ also considered treating source mental health

questionnaires, explaining:

> The record also includes two mental impairment questionnaires, the first of which
> was completed on October 26, 2022, by Harriet Bomas, APRN. Ms. Bomas opined
> the claimant to have "limited but satisfactory" mental abilities in all areas of
> sustained concentration and persistence, understanding and memory, social
> interaction, and adaptation (Exhibit B14F). Yet Ms. Bomas then goes on to opine
> that the claimant would likely miss more than two days of work per month and
> would be off task more than the normal allotted time (Exhibit B14F). This opinion
> is not fully persuasive as given on a check box form that fails to provide any
> narrative explanation or reference to treatment notes in support of such opined
> limitations. Moreover, all of the check marks on the form were "limited but

satisfactory", which is not actually defined in the form, but would appear to indicate the claimant has limits in these areas but could still perform work in a satisfactory manner. Such opinion is not inconsistent with the findings herein and actually supports them. Her opined missed days and time off task is also lacking any explanation or support and appears internally inconsistent given her other opinions as to "limited but satisfactory" mental work-related functions.

The second mental impairment questionnaire was completed on November 9, 2022, by a source with an illegible signature (Exhibit B16F). The source opined the claimant to be "seriously limited but not precluded" in almost all areas of mental functioning and likely to miss 1-2 days of work per week and to be off task (Exhibit B16F). Again, this is indicative of mental limitations but does not suggest work preclusion and is not fully persuasive. It is also given on a check box form that fails to provide any narrative explanation or reference to treatment notes in support of such opined limitations. The opinion regarding missed days and time off task is also lacking any explanation or support.

(Tr. 29.)

Ms. Roddy's argument regarding the mental RFC assessment is unclear and internally inconsistent.  Initially, she argues the ALJ erred because she "selectively adopted the RFC findings of the prior ALJ, except that she did not adopt all the previously identified limitations as 'the evidence in this claim period does not support the additional limitations.'"  (ECF Doc. 7, pp. 9-10 (citing Tr. 28-29).)  This argument suggests it was error for the ALJ not to adopt the prior ALJ's findings in their entirety.  But then she argues that the "ALJ erroneously relied on the opinions of the State Agency reviewing psychological sources . . . even though they violated the law in this matter and relied on the prior ALJ's findings" and asserts that "[r]elying on these opinions was not supported by substantial evidence as the evidence cited [in her brief] established that the medical documentation submitted after the prior ALJ decisions was new and material and supported greater limitations."  (*Id*. at p. 11.)  This argument suggests that the ALJ erred because she adopted the prior ALJ's findings instead of finding greater limitations.

Regardless of what specific argument Ms. Roddy intended to make, it is clear from the record that the ALJ provided a "fresh look" to the new evidence regarding Ms. Roddy's mental

impairments.  The Sixth Circuit has made clear that "[f]resh review is not blind review," *Earley*, 893 F.3d at 934, and it was not improper for the ALJ to consider the ALJ's prior findings when assessing the Ms. Roddy's mental RFC for the unadjudicated period under review.

The undersigned also finds Ms. Roddy's argument that it was error for the ALJ to rely on the state agency psychological consultants' opinions, which adopted the prior ALJ's findings, to be without merit.  The psychological consultants' opinions were relevant to Ms. Roddy's claim that she was disabled in part due to her mental impairments as it was the ALJ's responsibility to assess a claimant's RFC "based on all the relevant evidence in [the] case record."  *See* 20 C.F.R. § 416.945(a)(1); *see also* 20 C.F.R. § 416.946(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").  The ALJ did not adopt the psychological consultants' opinions wholesale, but carefully considered those medical opinions in addition to other evidence in the record, including Ms. Roddy's mental health treatment records (Tr. 26-27) and treating provider opinions (Tr. 29).[4]  Ms. Roddy has failed to demonstrate that the ALJ erred by considering the opinions of the psychological consultants in determining Ms. Roddy's mental RFC.

Finally, Ms. Roddy's conclusory assertion that the ALJ failed to consider new medical evidence when setting forth her opined limitations (ECF Doc. 7, p. 10) must also fail since the ALJ did consider the new medical evidence highlighted by Ms. Roddy in her brief (*compare* Tr. 26-27 *with* ECF Doc. 7, pp. 8-9).  It is also well established that the ALJ was not obligated to

---

[4] The ALJ found Ms. Roddy's treating provider opinions indicative of mental limitations but not suggestive of work preclusion and not fully persuasive.  (Tr. 29.)  Ms. Roddy does not challenge this determination.

discuss every piece of evidence to render a decision supported by substantial evidence.  *See*

*Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507–08).

For the reasons set forth above, the undersigned concludes that the ALJ took a "fresh

look" at the new evidence, consistent with *Earley*, before incorporating some RFC limitations

from the 2018 ALJ decision into the present RFC and finding other limitations were no longer

supported by the evidence.  Accordingly, the undersigned finds Ms. Roddy's first assignment of

error to be without merit and recommends that the Court find no procedural error in the ALJ's

consideration of the 2018 ALJ decision.

**C.**      **Second Assignment of Error: Whether RFC Was Supported by Substantial Evidence**

In her second assignment of error, Ms. Roddy argues the evidence establishes she could

not perform light exertional work, and that the ALJ's RFC therefore lacks the support of

substantial evidence.[5]  (ECF Doc. 7, pp. 12-15.)  More specifically, she contends that her

subjective testimony regarding her physical limitations is supported by the medical evidence,

which demonstrates she cannot perform light exertional work as found by the ALJ.  (*Id*.)  The

Commissioner responds that Ms. Roddy's second assignment of error simply recites her

subjective complaints and certain medical records that she contends support greater physical

limitations, without identifying subjective allegations or objective evidence that the ALJ failed to

consider, and further asserts that the adopted RFC was supported by substantial evidence.  (ECF

Doc. 9, pp. 10-11.)

A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. §

404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant

evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the

---

[5] Ms. Roddy does not separately argue that the ALJ's mental RFC lacks the support of substantial evidence.

administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity."); *Poe*, 342 Fed. App'x at 157.

Here, the ALJ concluded that Ms. Roddy had the physical RFC to perform:

> light work as defined in 20 CFR 416.967(b) except she can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; occasionally push/pull with the left lower extremity; never climb ladders, ropes, or scaffolds; never crawl; occasionally climb ramps and stairs; occasionally kneel and crouch; avoid concentrated exposure to respiratory irritants and all exposure to working at unprotected heights; avoid operating dangerous moving equipment such as power saws and jack hammers; and no commercial driving

(Tr. 23.)  In support of this light RFC, the ALJ considered the subjective complaints of Ms. Roddy, including her allegations that she could not work due to her left knee replacement and right hip giving out, could only stand and walk for about five minutes, relied on her family to do the cooking and cleaning in her home, and only left the house about once a month when her sister took her to the grocery store.  (Tr. 24.)  The ALJ then discussed the findings in Ms. Roddy's medical records in detail, including her surgical records, objective medical testing, and examination findings (Tr. 24-26), and assessed the persuasiveness of the state agency medical consultants' opinions as follows:

> [T]he State agency medical consultants also did not accept the prior Administrative Law Judge findings, given the new physical impairments (Exhibits B2A & B4A). The State agency consultants found the claimant limited to a light level of exertion with essentially the same postural and environmental restrictions found herein, including occasional push/pull in the left lower extremity (Exhibits B2A & B4A). Yet, they further noted the claimant limited to stand/walk of only four hours in an eight-hour day. The undersigned is only partially persuaded by these findings and agrees as to the lifting, sitting, and non-exertional limitations found. The consultants had the opportunity to review the record and supported their findings with detailed and rationale explanations as to the objective evidence relied upon in reaching these findings, which were consistent with the record at the time in which they were given and continue to be supported by the additional evidence received in connection with the hearing. However, the restriction to only four hours of stand/walk [6] is unsupported and inconsistent with the additional treatment records

---

[6] The undersigned observes that, even with a limitation to standing and walking four hours a day, the VE testified that there would be jobs available. (Tr. 49-51.)

received in connection with the hearing that show the claimant to have undergone left total knee arthroplasty with good response, improved functional status, and her doing well (Exhibits B11F, pgs 1, 4, 7; B12F, pg 1; & B13F, pgs 13-67). As detailed above, the treatment notes show the claimant to have exhibited only slightly reduced left knee range of motion by 10 degrees two months out from surgery with otherwise essentially normal exam findings (Exhibit B11F, pgs 1-2). The most recent treatment notes even show overall normal exam findings as of September 28, 2022, with no motor weakness, normal range of motion, and a normal gait, consistent with the claimant's continued improvement after surgery and a finding as to six hours standing/walking (Exhibit B12F, pgs 1-2).

(Tr. 28.)  Finally, the ALJ provided a detailed explanation of the basis for her RFC finding in light of the evidence of record, stating:

> The undersigned concludes that given the claimant's overall severe physical impairments, especially her bilateral knee osteoarthritis, the evidence of record continues to support the restriction to light level work with never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and occasionally kneel and crouch. The undersigned fails to find the need for limited balancing or stooping and no use of foot controls, given a lack of findings as to any significant ongoing ankle related abnormalities or treatment, no mid musculoskeletal or joint related issues, no significant right extremity findings, and no ongoing gait related abnormalities. Occasional push/pull with the left lower extremity seems better supported given the combination of the claimant's left ankle history and left knee osteoarthritis. No crawling was also added given the new findings of bilateral knee osteoarthritis. Further environmental restrictions as to the avoidance of concentrated exposure to respiratory irritants were given in accounting for the claimant's new additional impairments of asthma and hypertension, as well as preventative and safety related environmental restrictions in accounting for the claimant's overall conditions.

(Tr. 28).

In support of her argument that the ALJ erred in finding she could perform light work, Ms. Roddy provides her own summary of the medical evidence and her subjective complaints (ECF Doc. 7, pp. 13-15), but does not specifically identify any evidence that she asserts the ALJ misconstrued or failed to consider in assessing her RFC.  Additionally, while she contends that the evidence of record supports a less than light exertional RFC, she has not shown that the ALJ's contrary determination lacked the support of substantial evidence.  Because it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745

28

F.2d at 387, this Court cannot overturn the ALJ's decision "so long as substantial evidence …
supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  "'The substantial-
evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers
can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406.  Even if
substantial evidence supports Ms. Roddy's position that she cannot perform light exertional
work, this Court cannot overturn the Commissioner's decision "so long as substantial evidence
also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

 Having reviewed the records and the ALJ decision, the undersigned finds that Ms. Roddy
has failed to demonstrate that the ALJ ignored evidence or failed to account for limitations
caused by Ms. Roddy's physical impairments.  The undersigned further finds that the ALJ's light
RFC was supported by substantial evidence, including Ms. Roddy's overall good response to left
knee replacement surgery, relatively normal examination findings, lack of significant treatment
for Ms. Roddy's right knee, lack of ongoing or consistent complaints regarding the left ankle,
and the medical opinions of the state agency medical consultants.

 For the reasons set forth above, the undersigned finds Ms. Roddy's second assignment of
error to be without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


November 20, 2024

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## **<u>OBJECTIONS</u>**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within
fourteen (14) days after being served with a copy of this document.  Failure to file objections
within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire
v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).